**WILLIAM B. LOOK, JR.**
**Attorney at Law**
**PO BOX 1381**
**Monterey, CA  93942**
**831-372-1371/372-5779 FAX**
**email: look_mtr@yahoo.com**
**#66631**

**Attorney for Plaintiffs**

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carol Garrard, Robert Richardson, | ) **CASE: 3:20-cv-4706** |
| plaintiffs, | ) |
| | ) **CIVIL RIGHTS COMPLAINT** |
| vs. | ) |
| | ) **FOR DECLARATORY AND** |
| Gavin Newsom, Governor of the State of | ) **INJUNCTIVE RELIEF** |
| California, Xavier Becerra, Attorney | ) |
| General of the State of California, sued | ) |
| in their official capacity; Justices of the | ) **42 USC 1983** |
| California Supreme Court: Hon. Tani | ) |
| Gorre Cantil-Sakauye, Hon. Ming W. | ) |
| Chin, Hon. Carol A. Corrigan, Hon. | ) |
| Goodwin H. Liu, Hon. Mariano- | ) |
| Florentino Cuéllar, Hon. Leondra R. | ) |
| Kruger, Hon. Joshua P. Groban, **sued in** | ) |
| **their official capacity as rule makers and** | ) |
| **supervisory capacity over the California** | ) |
| **Commission on Judicial Performance,** | ) |
| **and Members of the California** | ) |
| **Commission on Judicial Performance:** | ) |
| Hon. Michael B. Harper, Dr. Michael A. | ) |
| Moodian, Hon. William S. Dato, Hon. | ) |
| Eduardo "Eddie" De La Riva, Ms. Sarah | ) |
| Kruer Jager, Ms. Kay Cooperman Jue, | ) |
| Hon. Lisa B. Lench, Victor E. Salazar, | ) |
| Esq., Mr. Richard Simpson, **sued in their** | ) |
| **supervisory capacity over the judiciary;** | ) |
| **Doe-CSC Members 1-3; Doe-CJP** | ) |
| **Members 1-3; Doe Defendants 1-10,** | ) |
| | ) |
| **defendants.** | ) |

**THEME OF CIVIL RIGHTS COMPLAINT**
National Public Policy Against Appearance of Judicial Impropriety
*Judicial Bigotry Is Not* Ipso Facto *Rendered Proper by the Label of 'Religion*'

"You must not distort justice; you must not show partiality, and you must not accept bribes for bribes blind the eyes of the wise and subverts the cause of those who are in the right." *New Oxford Annotated Bible*, Deut. 16:19, p. 278 (Oxford 2010)

"A trial court's appearance of impartiality is significant because the Court performs a unique governmental function--namely, the administration of justice. Trial courts perform this function for all [] citizens and may not discriminate among them." *Superior Court v. Public Employment Relations Bd.,* 30 Cal.App.5th 158, 178 (2018)

California in common with approximately 37 other states, has adopted a version of the American Bar Association Model Code of Judicial Conduct, enacted in California as the Code of Judicial Ethics. In common with the ABA version, Canon 2(C), relating to the "appearance of impropriety" facet of the fair-and-impartial-adjudication component of due process, contains a bar to judicial membership in organizations which practice "invidious discrimination." Also in common with the ABA Model Code, the California statute contains an exception that permits judicial  membership in religious organizations that practice invidious discrimination. California Canon 2(C) (last revised in 2017), varies in detail from the ABA model code and provides:

"A judge shall not hold membership in any organization that practices invidious discrimination on the basis of race, sex, gender, religion, national origin, ethnicity, or sexual orientation.
This canon does not apply to membership in a religious organization."

The ABA religion exception reads:

" A judge's membership in a religious organization as a lawful exercise of the freedom of religion is not a violation of this Rule."

The constitutional circularity of the references to 'religion' in the provision and its exception is evident *prima facie* since, as a general matter, most religions teach their beliefs are superior to and thus disparage, in greater or lesser degree, other religious teachings, so that the bar to invidious religious discrimination is effectively negated by the exception for religious

association, excepting perhaps for atheists. [1] Notably, the Federal Code of Judicial Ethics has no such Canon 2(C) 'religion exception.' [2]

More generally, plaintiffs allege and contend that the religion exception to the general bar to judicial membership in organizations practicing invidious discrimination is unconstitutional and discriminatory by favoring religionist beliefs over secularist, humanist, atheist, scientist, communist, etc., belief systems, all of which tend toward moral, ethical and eschatological concerns of their founders and members, and because the 'secular vs. religious' divide puts government in the position of deciding what the distinctions are between a secular organization's bigoted tenets and a religious organization's bigoted tenets, where both organizations teach their tenet is obligatory based on an alleged moral or ethical criterion.

To 'recycle' a metaphor from antecedent state legal proceedings, the religion exception of Canon 2(C) is a 'door' in the 'wall' of separation between religion and the state that lacks any secular or practical purpose. It cannot be justified merely as an accommodation to religion because 'freedom of conscience' must include the right to no belief at all or to 'moral' beliefs and 'values' that a citizen self-identifies with as secularist, humanist, communist, etc., instead of religionist. And the issue of 'labeling' a discriminatory practice as 'religious' as an alleged pretext, obliges one or more judges to evaluate the 'quality' or 'credibility' of the religious beliefs of other judges. To 'recycle' another metaphor, the Christian Roman cross is instantly

---

[1] The more verbose ABA version poses additional 'interpretive' issues and a higher risk of entanglement in adjudicating religious tenets, such as choice of law issues between secular vs. canon law, state vs. federal law, and civil vs. penal law in determining what is lawful vs. unlawful religious practice. The human sacrifice scenes from the film *Apocalypto* come to mind in this context, as setting at least one possible parameter. "Shunning" apostates and similar punitive religious practices entail more subtle distinctions in a vast 'middle range' of religious activities that might be alleged to be unlawful.

[2] Federal Code of Conduct for United States Judges, Canon 2(C), *passim*. This may derive from the bar in U.S. Const. Art. VI, clause 3, to a religious test for federal officials. The argument, "No thermometer exists for measuring the heatedness of a religious belief objectively. Either religious belief disqualifies or it does not. Under Article VI it does not." *(Feminist Women's Health Center v. Codispoti*, 69 F. 3d 399, 400 (9th Cir. 1995), Noonan, J.), is weakened by the distinction between appointment of federal officers and how they execute their office. Litigants don't appoint their judges. Thus while "In God we Trust" is the national motto, it is dubious as a sectarian motive for deciding cases.

3

recognizable as a religious symbol; but a flaming cross is also instantly recognizable in this society. Both symbols have religious overtones, yet the one is associated with invidious discrimination against "the sons of Ham." A colorable claim to the religion exception for membership in an organization associated with the flaming cross symbol could be asserted, based on belief in a scriptural 'curse' of perpetual servitude. *See, e.g.*, Christian Bible (KJV), Old Testament, Book of Genesis verse. 9:18-27 and Book of Joshua verse 7:23. [3]

In the context of this case, the state trial judge in issue is a member of the Seventh Day Adventist Protestant denomination. The 28 Fundamental Beliefs all Adventists are required to adopt before becoming baptized members include *inter alia* bans on gay sex, gay marriage, abortion, and other lifestyle choices which is generally regarded as invidious discrimination. The Adventists are also hostile to beliefs of other Christian denominations that, contrary to Adventist "Saturday Sabbath" belief, worship on Sunday. The Adventists are also overtly anti-Catholic and include a 'belief' the papacy is allied with or constitutes the evil "anti-christ" of Christianity.

The Adventists believe the United States constitutes part of the evil "anti-christ" and must be overthrown in a violent confrontation in which, *inter alia*, all Sunday worshiping 'pagans' will be annihilated and cast into a "lake of fire." Generally, these Adventist beliefs and tenets are derived from the writings of a woman named Ellen G. White, 1827-1915.

Adventists believe White received visions directly from God. White's writings allegedly inspired by her visions were then, and have been since the 19th Century, controversial. White was raised in the Methodist faith as were other founding members, who organized as Seventh Day Adventists after being expelled from the Methodist denomination in the wake of a failed

---

[3] Plaintiffs and all other members of the Richardson family are sons and daughters of Ham; that is, Black Americans. Slavery was a Hebrew 'peculiar institution' permitted by Scripture. *E.g.*, Lev. 25:44-46; Deut. 15:12-18. War captives were treated as booty (Num. 31:9; Deut. 20:10-15); the Old Testament permits sexual exploitation of female captives. Deut. 21:10-14. There were Hebrew slaves of Hebrews. See http://www.jewishencyclopedia.com/ "slavery." In the modern era, Israel is a parliamentary democracy with statutory human rights guarantees. But, in common with several nations in the Near East, human trafficking is an issue for Israel. https://www.state.gov/wp-content/uploads/2019/06/2019 -Trafficking-*in*-Persons-Report pdf, p. 253-256. There is no express condemnation of slavery in the New Testament. *Pfeiffer New Combo. Bible Dictionary and Concordance*, "Slave" p. 394 (BakerBooks 1996).

"second coming" to occur in 1844, during the ante-bellum Great Awakening (aka "Frontier-Revivalist") movement in U.S.A. American Methodists, after John Wesley, attain to 25 Articles of Religion on which the Adventists' 28 Fundamental Beliefs are based, in concept at least. The idea the Pope is the anti-christ comes directly from John Wesley's *Bible Commentary*- and sundry other Reformation propagandists. The 'technical' terms for the Adventists' preaching, common to 19th Century revivalism based on an imminent "second coming," are *pretribulational dispensationalism*. Relevant here, however, is Methodist Article 23, absent from the Adventist 28 Beliefs, which proclaims *loyalty to the United States* and its constitution. [4]

Thus one prime issue raised herein is that if a residential landlord (*Smith v. Fair Employment & Housing Com.*, 12 Cal.4th 1143 (1996)), a baker (*Klein v. Dept. of Labor*, 289 Ore. App. 507 (2017)), or a florist (*State v. Arlene's Flowers, Inc.,* 441 P.3d 1203 (2019)), can be compelled to chose between religious scruples and how they do business, creating an ethical 'dispensation' for judges' religionist bigotry while in public office is an arrogant, elitist, discreditable, and unconstitutional accommodation, that gives judges a special privilege to engage in religionist bigotry 'on the job' the ordinary citizen cannot obtain, even if that ordinary citizen's religious beliefs are just as closely and fervently held as any judge's religious beliefs.

---

[4]The role Adventists' anti-United States beliefs have in attracting 'fellow-travelers' outside  the U.S.A. where they actively recruit, and are or may become a vector for terrorism, is beyond the scope of this pleading. However, the treatment of the Yazidi's at the hands of Isis in 2014 during the period of its control in Northern Iraq, is a contemporary  object lesson in what happens when a constitutional authority is replaced by theocratic rule. *See e.g.,* https://www.un.org/sexualviolenceinconflict/wp-content/uploads/2019/08/report/a-demographic-documentation-of-isiss-attack-on-the-yazidi-village-of-kocho/Cetorelli_Demographic_documentation_ISIS_attack.pdf. An ancient example is the forced conversion of the Idumean Arab tribes of the deserts south of Judea to Judaism 'at the point of the sword' to create a 'buffer state' by John Hyrcanus (one of the Maccabeean war lords); biblical Herod the Great, descended from these *conversos*, rose to power as a Roman *satrap* in an ironic twist.  The Massachusetts Bay Colony of the Puritans  in the in Colonial era is a familiar example of an oppressive Christian 'dictatorship of the clerics.' The allegation thus is: The 'dictatorship of the clerics' of theocratic states is anti-democratic and antithetic to personal liberty and, as clearly as it is possible to be, unconstitutional regardless of the religionist casuistry offered to justify theocracy. Plaintiffs, while conceding the right of private citizens to hold such beliefs, also allege: A judge who believes in the overthrow of the United States in favor of a theocratic state, is disqualified to preside by equivocating the judicial duty to uphold and defend the Constitution of the United States-- against *all* adversaries foreign or domestic.

Therefore, in the traditional terminology of constitutional legal analysis, plaintiffs allege

1   the religion exception to Canon 2(C) cannot withstand strict scrutiny under the First Amendment

2   of the United States Constitution because it lacks a rational state purpose unrelated to religion,

3   and because it constitutes an establishment of religion by treating religionist belief and practice

4   more favorably than secular belief and practice, and entangles the courts in deciding a) what the

5   beliefs of a religion are, and in b) interpreting and evaluating such religious beliefs,  in

6   distinguishing between secular invidious discrimination and religious invidious discrimination.

7   Therefore, plaintiffs allege  the religion exception to California Code of  Judicial Ethics Canon

8   2(C) is unconstitutional under *Stone v. Graham* (1980) 449 U.S. 39, 40-41; *Lemon v. Kurtzman*

9   (1971) 403 U.S. 602, 612-613, and seek declaratory and injunctive relief against further

10  enforcement of said religion exception.

11                                          **PARTIES**

12  **Plaintiffs:**

13  1. Carol Garrard and Robert Richardson, are brother and sister and individuals with a common

14  interest in a parcel of real property in dispute in a California state court proceeding in which their

15  civil rights have been violated or abrogated or otherwise denied to them, by the actions of the

16  defendants herein identified, and in particular by the unlawful enactment and enforcement the

17  religion exception to California Judicial Canon 2(C), which they contend violates the

18  Constitutional bar to governmental establishment of religion and entanglement in religious

19  beliefs and associations, and chills and suppresses their own liberty interests in religion,

20  guaranteed to them by the United States Constitution.

21  **Defendants:**

22  2. Governor Gavin Newsom is the chief executive officer of the State of California and in his

23  official capacity is charged with the enforcement of the laws of said state generally, and

24  specifically with the duty to enforce and protect the civil rights of the citizens of the State of

25  California guaranteed by the United States Constitution and the Constitution of the State of

26  California. The governor is a resident of San Francisco, CA, with offices in this District.

27

3. Attorney General  Xavier Becerra, is the chief law enforcement officer of the State of California charged with the enforcement of the laws of said state generally and specifically with the duty to enforce and protect the civil rights of the citizens of the State of California guaranteed by the United States Constitution and the Constitution of the State of California. The attorney general maintains one or more offices within this District.

4. The Supreme Court of the State of California, and the justices herein named, are sued in their official capacity as rule makers in promulgating the Canons of Judicial Ethics incorporated into the California Code of Judicial Conduct, pursuant to  Cal. Const., art. VI, § 18, subd. (m). The Court is also sued in its policy making, enforcement and supervisory capacity in its authority over its enforcement arm, the California Commission on Judicial Performance, charged with the 'day to day' enforcement of the Code of Judicial Ethics. Said court maintains offices in this District in San Francisco, California.

    A.) As of the filing of this complaint, the justices of the California Supreme Court known to plaintiffs are: Hon. Tani Gorre Cantil-Sakauye, Hon. Ming W. Chin, Hon. Carol A. Corrigan, Hon.  Goodwin H. Liu, Hon. Mariano-Florentino Cuéllar, Hon. Leondra R. Kruger, Hon. Joshua P. Groban;

    B.) Doe-CSC Members 1-3, are members of the court who may be appointed or elected to serve, or to serve in the stead of any of the foregoing, during the pendency of this action.

4a. The California Commission on Judicial Performance, and its members named herein, are sued in their official enforcement capacity as an administrative agent of the said California Supreme Court charged with the authority to enforce the California Code of Judicial Conduct. Said commission maintains one or more offices within this District.

    A.) As of the filing of this complaint, the known members of the California Commission on Judicial Performance are: Hon. Michael B. Harper, Dr. Michael A. Moodian, Hon. William S. Dato, Hon. Eduardo "Eddie" De La Riva, Ms. Sarah Kruer Jager, Ms. Kay Cooperman Jue, Hon. Lisa B. Lench, Victor E. Salazar, Esq., **Mr. Richard Simpson;**

B.) Doe-CJP Members 1-3, are members of the commission who may be or many have

been appointed to serve, or to serve in the stead of any of the foregoing, during the pendency of

this action.

5. Does 1-10 are persons or entities who may be identified at a later time as a proper party

defendant to this action, including necessary or indispensable parties, but who are mis-identified

or unknown to plaintiffs at this time, and therefore are named herein as a fictitious  party.

**JURISDICTION AND VENUE**

6. This case raises questions under the Constitution of the United States and 42 U.S.C. § 1983,

and thus this Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all parties are domiciles

of the State of California. Venue is also proper because the state defendants all maintain offices or

other facilities in the San Francisco Bay Area, and a substantial part of the events giving rise to

the claim occurred in this District, and in that the parcel of real property in dispute in the state

legal proceeding in issue is located in this District.

**FACTS AND NATURE OF THE CASE**

8. This action arising under 42 U.S.C. § 1983 for enforcement of plaintiffs civil rights under the

First, Fifth, and Fourteenth Amendments of the United States Constitution seeks  the remedy of a

declaration that the religion exception of California Judicial Canon 2(C) is unconstitutional and

unenforceable, and for a preliminary and  permanent injunction against enforcement of the same

by the State of California and its officials named herein or any future occupant of those offices.

To the extent *vacatur* of the judicial acts of the disqualified state judge is an available remedy in

this forum, plaintiffs seek *vacatur nunc pro tunc,* from and after January 1, 2018, of all judicial

acts of the state judge. Plaintiffs also seek to recover all their attorneys' fees, costs, and expenses

incurred in this action and any other relief that this Court may order.

9. The present dispute arises from a pending California civil lawsuit in which plaintiffs herein are

also plaintiffs. The state trial judge assigned to plaintiffs pending state action, Superior Court for

Monterey County California action 16CV002776, is Marla O. Anderson,   a member of the

Seventh Day Adventists, a protestant Christian  religious organization that, pursuant to its 28 Fundamental Beliefs, holds to tenets of invidious discrimination that were not disclosed by the judge upon assignment to plaintiffs' state case in 2018, and her membership in said religious organization practicing invidious discrimination was not discovered by plaintiffs until 2020. See Exhibit 1, 28 Fundamental Beliefs, incorporated by reference. Said beliefs constitute invidious discrimination because no individual  who does not comply with the 28 Beliefs can be baptized into the Adventist church or become a minister, elder or other official thereof. But for the religion exception to California Judicial Canon 2(C), said judge would have been disqualified from presiding because of membership in an organization practicing invidious discrimination, and they seek relief under 42 U.S.C. § 1983.

10. As and for an additional ground of relief, the Seventh Day Adventists, based on alleged divine revelations to a founding matriarch, Ellen G. White, in the 19th Century, regards the United States as, or as a constituent part of, the evil  "anti-christ" of Christian belief, and are committed to the overthrow of the United States by a theocratic state. They further believe that the process of overthrow began in 1844, and is ongoing.  Plaintiffs further seek relief under 42 U.S.C. § 1983, and the 1st, 5th and 14th Amendments of the United States Constitution, for violation of their right to adjudication of their state case by a fair and impartial judge  who has taken a sincere and unequivocal oath to protect, defend and uphold the Constitution of the United States as well as the Constitution of the State of California, and to uphold and protect their personal liberties guaranteed thereunder, without religious reservations.

   A. The Adventists' belief in the overthrow of the United States has in past at least posed a direct and bloody threat to the peace and welfare of the United States. In 1993, leading up to a notorious, well publicized and televised event known as the Siege of Waco Texas, a sub-group of Seventh Day Adventists lead by an individual calling himself David Koresh, armed themselves with military grade weapons in preparation for the coming Armageddon and overthrow of the United States prophesied by Ellen G. White. The United States Bureau of Alcohol, Tobacco and Firearms (ATF), with the assistance of the Federal Bureau of

Investigation and local law enforcement agencies, attempted to disarm Koresh and his Adventist followers. 86 people, including law enforcement and children under age 10, were killed in the resulting stand off, the federal assault on Koresh's "compound" of wooden structures, a series of gun-fights, and "climactic" structural fire of disputed origin. Ironically the ATF operation that resulted in the siege was code named, "Showtime."

B. All Adventists are required to follow the teachings of Ellen G. White by Fundamental Belief # 18. Their belief system identifying he United States with the 'anti-chritst' and overthrow of the United States is current and being 'preached' (publicized) by church sponsored media, such as, *Adventist Review* on-line article, "The Mark of the Beast," 3/21/2020 (https://www.adventistreview.org/1806-36) ; *Spectrum Magazine* on-line article, "America and The Two Horned Beast of Revelation 13," 3/25/2020 (https://spectrummagazine.org/journal/archive); A.L. Duncan and E.G. White, *America, the Papacy and The Signs of the Times,* Ch. 7, 9*, passim* (Advent Truth Ministries 2015 [Kindle ed.]); and see Ellen G. White, *The Great Controversy: Global War on Freedom* (Pacific Press 2002 [a reprint of an 1888 edition, originally titled *The Great Controversy between Christ and Satan*]), the latter two writings are published with garish, politicized  propaganda covers. See Exhibits 2, 3 attached hereto and incorporated by reference.

C. The Adventists believe, based on other teachings of  Ellen G. White, that the laws of God have precedence over the laws of 'mere' men, and therefore in the instance of a conflict an Adventist must follow God's law and abjure the law of man contrary to God's Word..

D. The Adventists believe  that the Roman Catholic papacy is 'anti-Christ' and that Catholics and all mainstream Protestant denominations who worship on Sunday, as allegedly decreed by pagan Romans, instead of Saturday under the Adventist doctrine of Saturday Sabbath, are themselves pagans who will be annihilated  and consumed in a "lake of fire" in the violent process of overthrow of the United States that Adventists believe began in 1844 and is ongoing in a preliminary phase, based on the 19th Century 'prophesies' of Ellen G. White. Such

invidious anti-Catholic propaganda has an odious history in U.S.A.. See Exhibit 4, attached

1    hereto and incorporated by reference.

2           E. From the foregoing belief system arises an appearance of impropriety and reasonable

3    belief Judge Anderson is not capable of fair, objective and rigorous application of secular law

4    and only secular law in deciding plaintiffs' case, untainted by bias and religious tenets of the

5    Adventist faith.  Investigation in February and March 2020 disclosed public comments by Judge

6    Anderson that her courtroom actions are guided by  her religious convictions, such as her video

7    presentations at http://cvvnet.org/m/index.php?cmd=view&id=1423; and at:

8    https://vimeo.com/channels/godcreated/53621385. There is also an appearance of impropriety

9    arising from her belief that the United States and its Constitution are impermanent and violate

10   which creates the appearance if not actuality she has only an equivocal commitment to uphold

11   and defend the United States' and  California Constitutions.

12   11. The Adventist congregations in the United States are organized on ethnic and linguistic lines,

13   such that there are Mandarin Chinese, Korean, Hispanic, White and Black congregations,

14   typically located  in urban and suburban areas where there are 'ethnic enclaves.' Seaside

15   California traditionally has had the largest black population in Monterey County, California, an

16   outgrowth of the situs of former Army base Fort Ord, and integration of the military which

17   brought black soldiers and their families to Monterey County starting in the 1950's. Until  the de-

18   commissioning of Fort Ord, the west boundary of part of the military reservation and east

19   boundary of Seaside were contiguous. Carol Garrard's and Robert Richardson's father was a

20   black veteran who mustered out at Fort Ord, and thereafter operated a billiard parlor business in

21   Seaside, and resided in Seaside's black 'neighborhood' until his death. The underlying legal

22   dispute concerns the family residence, a part of the estate of their mother, Alice Richardson.

23   Judge Anderson's spouse is the black pastor of the local black Adventist congregation. in

24   Seaside, CA. Members of the extended Richardson family have ties to that Seaside congregation,

25   such that Judge Anderson knew or should have known the religious affiliation of plaintiffs was

26   not Adventist.

27

12. The underlying state case, Monterey County Superior Court action 16CV002776, is a form of 'wrongful foreclosure' case in which plaintiffs seek to recover the title to, or compensation for, their mother's home at 1710 Laguna Street, Seaside CA 93955 (real property within this district). The dispute originated in 2006, during the probate of the Estate of Alice Richardson, wherein plaintiff Carol Garrard as administrator, was defrauded by a real estate broker named David Shapiro, of Las Vegas Nevada, who by use of the mail and telephone, transacted a loan in California secured by said 1710 Laguna Street. The loan was intended to finance refurbishing the family home to conform to the local municipal building code. The loan transaction (hereinafter 2006 Loan) was illegal since *inter alia* David Shapiro was not licensed by the California Department of Real Estate to broker loans in California and both state and federal laws were violated in consummating the loan across state lines. That illegality also included use of a Nevada title insurance company not admitted to do business in California to generate and record a trust deed. There were six private 'investors' in the loan, none of whom were California residents at that time.

12a. The illegal loan by happenstance came due just as the so-called (by legal authority Miller & Starr) Great Recession and banking and real estate financing 'panic' that caused real estate values to collapse, began in Fall 2007. Being unable to refinance the short-term 2006 Loan, plaintiff Carol Garrard defaulted and the loan was foreclosed. After the fraud and illegality of the 2006 Loan was discovered, the first iteration of this wrongful foreclosure action was filed in 2008 as Monterey County California Superior Court Action M90047, an action settled by a written agreement in 2011, constituting a form of retraxit having res judicata effect under California law, that replaced the 2006 Loan. Subsequently however, by use of false evidence presented at a 2015 default hearing, the investors in the 2006 Loan obtained a judgment reinstating the illegal 2006 trust deed. The state defendants' actions were motivated by the fact the real property was 'underwater' in 2007, but by 2015 its value had recovered so that it was worth more than 150% of the secured debt. The pending state action 16CV002776 was the second iteration of the wrongful foreclosure action, filed initially to prevent and later to vacate

an ensuing second 2016 foreclosure sale of the subject real property by use of the illegal 2006 trust deed. The later state lawsuit is now pending on appeal in the California Sixth District Court of Appeal as action H047728, contending *inter alia* the 2015 default judgment is void.

13. In the underlying state case, Plaintiff Garrard has a title and Plaintiff Richardson a lien interest in the subject real property, both derived from the Estate of Alice Richardson. Yet another fraud prompted Richardson's filing of an intervention complaint in the wrongful foreclosure case in 2018, contending his lien is superior to the lien foreclosed. A $50,000.00 element of the alleged deficiency is disputed in the state case, and at the time of the 2016 foreclosure defendants in the state action secretly added to the deficiency, and credit bid a total of which at least $87,000.00 was surplus funds to which plaintiff Richardson asserts a right as a lien holder of record. This 'scam' is well documented. The source-accuracy of the state defendants' figures is in dispute but the originating notice showed the deficiency balance claimed by the state defendants was $287032.70, shown by exhibit 5 attached and incorporated. The  total credit bid shown by the cryer's auction notes in Exhibit 6, attached and incorporated, was $320000.00. And the excess was discovered to be a result of a hand-altered worksheet. Compare Exhibit 7a & 7b, attached and incorporated, showing  $37,000.00 added to the deficiency '*ad hoc*.' Thus this dispute is also about a post-sale fraud and conversion of at least $87000.00 of sale proceeds.

14. Although Judge Anderson was assigned to this case in January 2018, at no point then nor thereafter did she disclose her membership in an organization practicing invidious discrimination. Judge Anderson's affiliations were discovered in February and March 2020, prompted by  *sua sponte* remarks made by her at a state court hearing.  A petition for a Writ of Mandate, based on a violation of California Code of Judicial Ethics Canon 2(C) and challenging the constitutionality of the religion exception under state law, followed as California Sixth District Court of Appeal case H048043; but was summarily denied. A follow on petition for Writ of Review in the California Supreme Court, case S262794,  was timely filed, but in plaintiffs' expectation has little chance of being granted for lack of a conflict of authority construing Canon 2(C), and the interlocutory nature of the issues presented prior to judgment.

15. Because Judge Andersons's  membership in a religious organization practicing invidious discrimination was discovered so late in the case, the opportunity to exercise any form of challenge to her assignment based on invidious practices of Adventists under California Code of Civil Procedure § 170.1 *et seq*., was lost due to passage of time.

16. Although summary denial of a discretionary writ is not a decision on the merits in California, petitioners did first make a good faith and diligent attempt to obtain relief from oppression and violation of their fundamental liberty interests in fair and impartial adjudication and to freedom from religious discrimination, in the state system, before filing this federal action.

17. Plaintiffs therefore lack any plain, speedy or adequate remedy at law from the pernicious effects of the religion exception to California Code of Judicial Ethics Canon 2(C), and therefore seek a declaration said exception is unconstitutional and for injunctive relief barring enforcement of said religion exception to Canon 2(C).

18. Despite the fact Canon 2(C) puts the matter in issue, as much as financial, professional, marital or familial conflicts of interest are in issue on the question of the Appearance of Impropriety, it is not customary for judges to disclose their religious affiliation and secular membership(s) when assigned to a particular case, and thus as a general matter Canon 2(C) is a 'silent' ground for disqualification, even as to membership in secular organizations practicing invidious discrimination. Plaintiffs only discovered the religious issue long after the state case was pending, and remain to this day ignorant of the state judge's secular memberships, if any, and whether they pose any issues of invidious discrimination.

**CLAIMS FOR RELIEF**

**CLAIM ONE: DUE PROCESS**

19. Plaintiffs incorporate here by reference all foregoing allegations, including paragraphs 1 through 18, *supra,* as if fully set forth herein.

20. California Judicial Canon 2(C) violates fundamental liberties that are protected by the Due Process Clause, both on its face and as applied to Plaintiffs,  in that the religion exception to disqualification of California judges denies plaintiffs adjudication before a fair and impartial

judge with an unequivocal commitment to uphold and defend the United States and its Constitution, uphold and defend the State of California and its Constitution, and to enforce the secular law of California in an objective manner uninfluenced by religious bias, belief or convictions of the supremacy of religious tenets and "God's law" over and above secular law and procedure.

## CLAIM TWO: RELIGIOUS FREEDOM

21. Plaintiffs incorporate here by reference all foregoing allegations, including paragraphs 1 through 20, *supra,* as if fully set forth herein.

22. California Judicial Canon 2(C) violates fundamental liberties that are protected by the Due Process Clause, both on its face and as applied to Plaintiffs, in that the religion exception to disqualification of California judges based on membership in organizations practicing invidious discrimination, denies and abridges plaintiffs' First Amendment right to freedom from the establishment of religion and entanglement of state government in religious affairs and by favoring religious belief over secular belief, by fostering religious bigotry while purporting to punish secular bigotry, even where the acts, tenets and practices constituting invidious discrimination by an organization are the same.

## CLAIM THREE: EQUAL PROTECTION OF THE LAW

23. Plaintiffs incorporate here by reference all foregoing allegations, including paragraphs 1 through 22, *supra,* as if fully set forth herein.

24. The religion exception in California Judicial Canon 2(C) violates the Equal Protection Clause of the Fourteenth Amendment, both on its face and as applied to Plaintiffs and all others similarly situated.. Under Canon 2(C) all parties and their counsel appearing in a California state court are protected from judges who hold membership in secular organizations practicing invidious discrimination, but any party or counsel, including plaintiffs who appear in the courtroom of a judge holding membership in a religious organization practicing invidious discrimination, are not protected solely on the basis of religion. They have been and will be harmed by  the appearance of impropriety arising from permitting judicial bigotry on the basis of

religion, and from actual bias and prejudice arising from religious doctrines and tenets incompatible with secular law that have and continue to bear upon and influence the exercise of discretion by a state judge who is a member of a religious sect whose beliefs and tenets permit, foster and engender invidious discrimination.

25. Petitioners and all others similarly situated are also denied equal protection of the law because of the failure of defendants to enforce California Constitution Article 1, § 7(b), which provides in relevant part:

> "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens."

The religion exception in California Judicial Canon 2(C) violates California Constitution Article 1, § 7(b) by allowing a class of citizens, that of state judges, the privilege to engage in, and immunity from sanction for, bigotry by permitting judges to be or become members of organizations which practice invidious discrimination so long as they are religious, but denying the same permission and immunity to judges belonging to secular organizations that practice invidious discrimination. There is no practical difference between the pernicious effects of invidious discrimination based on religion instead of secular beliefs and tenets. Treating the same conduct by the sub-set of judges who claim a religious basis for membership in organizations practicing invidious discrimination from the remainder of judges, is to grant a special privilege authorizing, and a grant of immunity from sanction for, judicial bigotry that violates California Constitution Article 1, § 7(b) and the Fourteenth Amendment. Thereby plaintiffs have and continue to be harmed by the assignment of their state case to a judge authorized and permitted to engage in religious bigotry under the religion exception to state Canon 2(C).

### CLAIM FOUR: VIOLATION OF 42 U.S.C. § 1983

26. Plaintiffs incorporate here by reference all foregoing allegations, including paragraphs 1 through 25, *supra,* as if fully set forth herein.

27. Insofar as they are enforcing the religion exception in California Judicial Canon 2(C), Defendants, acting under color of state law, are depriving and will continue to deprive Plaintiffs of their rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

**IRREPARABLE INJURY**

28. Plaintiffs incorporate here by reference all foregoing allegations, including paragraphs 1 through 27, *supra,* as if fully set forth herein.

29. Plaintiffs are now severely and irreparably injured by the religion exception in California Judicial Canon 2(C) a state rule or law that violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. By way of example only, Plaintiffs' injury as a result of the religion exception in California Judicial Canon 2(C) includes the deprivation of the right to a fair and impartial trial and adjudication of all issues in their underlying state lawsuit based upon even handed application of secular, state law untainted by bias and prejudice and discrimination of judicial religious bigotry– or the appearance the decisions and exercise of discretion by the state trail judge are informed by discriminatory religious beliefs and tenets, including any tenets that would tend to place alleged 'god's law' over and above the federal or state Constitutions or any other secular law, rule, regulation, ordinance or policy that applies or may apply to the adjudication of their state lawsuit.

30. In the peculiar instance of the state judge in issue, Marla O. Anderson, again by way of example only, Plaintiffs are now severely and irreparably injured by being forced to appear before a judicial officer who identifies the United States with the evil 'anti-christ' of Christian belief, believes in the violent overthrow of the United States by a theocratic state, and thereby is not unequivocally committed to uphold and defend the Constitution of the United States, nor to uphold and defend Plaintiffs' civil rights under said Constitution nor the California state Constitution, and has made public statements that she applies her religious beliefs in presiding and deciding the cases assigned to her in the state court system.

31. An actual, ongoing and judicially cognizable controversy exists between Plaintiffs and Defendants regarding whether the religion exception in California Judicial Canon 2(C) violates Freedom of Religion under, and Due Process and Equal Protection Clauses of the Fourteenth Amendment, and derivative elements of the California state constitution. Defendants are presently enforcing this state law to the actual and ongoing detriment of Plaintiffs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1. Plaintiffs respectfully request that this Court, pursuant to 28 U.S.C. § 2201, construe and enter a declaratory judgment:

A. That the religion exception in California Judicial Canon 2(C) enables judicial bigotry, establishes religion, and entangles state government in religious doctrine and practice, and thereby violates the First Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment and 42 U.S.C. § 1983;

B. That California Judicial Canon 2(C), by creating a special privilege based on religious membership only applicable to judges, thereby violates the First Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment and 42 U.S.C. § 1983;

C. That the failure of the State of California to require judicial disclosure of all memberships in organizations with restrictive practices prior to or at the time of a judicial assignment, renders California Judicial Canon 2(C) ineffective, even assuming it is constitutional in whole or part, and thereby violates the First Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment and 42 U.S.C. § 1983;

D. That the failure of the State of California to require unequivocal judicial commitment to uphold and defend the Constitution of the United States and compel full disclosure of all religious, secular or other belief in the overthrow of the United States, prior to or at the time of a judicial assignment, thereby violates the First Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment and 42 U.S.C. § 1983;

E. That Defendants Gavin Newsom, in his capacity as governor and  chief executive officer, and Xavier Becerra, in his capacity as attorney general and chief law enforcement officer, have denied plaintiffs the equal protection of the California State Constitution, by failing to enforce Art. 1, § 7(b) of the California State Constitution against defendant justices of the California Supreme Court and  members  Commission on Judicial Performance, at the time of enacting a special privilege based on religious membership only applicable to judges under California Judicial Canon 2(C), or thereafter, and thereby violated the First Amendment and  Due Process and Equal Protection Clauses of the Fourteenth  Amendment and  42 U.S.C. § 1983.

2. Plaintiffs respectfully request that this Court enter a preliminary and a permanent  injunction enjoining enforcement or application of the religion exception to California Judicial Canon 2(C) and enactment of any other similar California law that enables judicial religious bigotry in office.

3. Plaintiffs also seek *vacatur* of all judicial acts of the state judge from and after her initial assignment to their state case January 1, 2018, to the fullest extent of this court's jurisdiction to grant such relief, *nunc pro tunc*.

4. Plaintiffs respectfully request costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988, and all further relief to which they may be justly entitled.

Dated: July 14, 2020                            _____
                                                                 Attorney for Plaintiffs